Frank H. CARR, M.D., Plaintiff

v.

HEALTH INSURANCE PLAN OF GREATER NEW YORK, INC., the Queens–Long Island Medical Group, P.C. and Reza Sabet, M.D. Defendants.

No. 99Civ.3706(NRB).

United States District Court,
S.D. New York.

Aug. 31, 2000.

Stephen T. Mitchell, New York City, for Plaintiff.

Eva Coben Talel, Stroock & Stroock & Lavan, New York City, for Defendants.

## OPINION AND ORDER

BUCHWALD, District Judge.

Plaintiff Frank H. Carr ("plaintiff" or "Carr") brings this action against defendants Health Insurance Plan of Greater New York ("HIP"), the Queens–Long Island Medical Group, P.C., and Reza Sabet ("Sabet") (collectively, "defendants"), alleging that they violated his federally protected right to contract under 42 U.S.C. § 1981, as well as under related state and city provisions, N.Y. Exec. Law § 296 and N.Y.C. Admin. Code § 8–502. Defendant now moves this Court for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff cross-moves for further discovery pursuant to Rule 56(f). For the reasons set forth below, defendants' motion is granted in part and denied in part. Plaintiff's motion for further discovery is also granted in part and denied in part as subject to the conditions set forth below.

## BACKGROUND

Except as noted, the following pertinent facts are either undisputed or construed most favorably to the plaintiff.[1]

Defendant HIP is a not-for-profit corporation, authorized to operate as a medical expense indemnity insurer and health maintenance organization under New York law. Def. 56.1 ¶ 1. To provide medical care to its customers, HIP generally contracts with a number of independent medical groups to render such care. Id. ¶ 2.

---

1. We note, in this regard, that we deem as admitted by plaintiff those factual allegations that are listed in defendants' Statement of Material Facts Pursuant to Local Rule 56.1 (hereinafter "Def. 56.1") but were not specifically challenged by plaintiff in his own Counter Statement by the Plaintiff to Defendants' Statement Pursuant to Local Rule 56.1 (hereinafter "Pl. 56.1"). *See Monahan v. New York City Dep't of Corrections,* 214 F.3d 275, 292 (2d Cir.2000).

HIP also supplements the amount of medical care available to its customers by contracting with various independent doctors, hospitals, and consultant specialists so that the independent medical groups can make referrals to those providers "when they deem it to be in their patients' best medical interests." *Id.* ¶ 3.

The Queens–Long Island Medical Group, P.C. ("the Group") is one such independent medical provider. It is a professional corporation engaged in the practice of medicine and it contracted with HIP to supply medical services to HIP customers in Queens, Nassau, and Suffolk counties. *Id.* ¶ 4. The Group was formed in 1990 as the result of a consolidation among three smaller such groups. Affidavit of Reza Sabet, dated Jan. 27, 1998 ("Sabet Aff.") ¶ 2 n. 1.[2] Defendant Sabet is the President and Medical Director of the Group and has held that position during all times relevant to this action. Def. 56.1 ¶ 5.

Plaintiff Carr is an African–American orthopedic surgeon who has been practicing medicine for almost twenty years. Pl. 56.1 ¶ 3. Carr joined one of the Group's three predecessors, East Nassau Medical Group ("East Nassau"), as an orthopedic surgeon in July of 1985, although he took an extended leave of absence from East Nassau from September 1986 to August of 1988. Def. 56.1 ¶ 7–8. Along with the rest of East Nassau, Carr took part in the 1990 merger, becoming both a shareholder and an employee of the newly constituted Group. *Id.* ¶ 9. Throughout the years that Carr was affiliated with the Group, he treated HIP patients referred to him by the Group. Pl. 56.1 ¶¶ 5–6.

As a part of the contracts between HIP and East Nassau, and between HIP and the Group, the parties agreed that any physician affiliated with the Group would be required to obtain Board certification in his or her respective specialty by the American Board of Medical Specialties ("ABMS") or the American Osteopathic Board of Medical Specialties ("AOBMS") within five years of joining the Group. Def. 56.1 ¶ 6. In August of 1986, Isobel Pollack, a "senior vice president" with HIP, sent Carr a letter reminding him that "that all physicians have five years, from the time of their Medical Control Board approval date, to become Board Certified." HIP's Notice of Motion ("HIP Mot."), Ex. 1. The letter warned Carr that if he were not "Board Certified in your specialty by *January 1991,*" then "you will be asked to leave your position." *Id.* (emphasis original). Carr received a similar letter from another HIP vice president, Jesse Jampol ("Jampol") in May of 1989, several months after he returned from his leave of absence in 1988. *Id.,* Ex. 3. Apparently, that letter restarted Carr's five-year time limit because Jampol sent another letter in April of 1993, reminding Carr that he had until April of 1994 to become Board Certified. *Id.,* Ex. 4.

In December of 1995, yet another HIP vice president, J. Michael Hogan ("Hogan"), sent a letter to Carr advising him that HIP's records indicated that the April, 1994 deadline had expired without Carr having obtained his Board Certification. In response,[3] Carr forwarded a copy of a "Board certificate" issued in December of 1987 by the "American Board of Clinical Orthopaedic Surgery." *Id.,* Ex. 5. Carr also informed Hogan that he was "in the process of [sic] double Boarded in Orthopedic Surgery" and was "scheduled to take the Boards in July, 1995." *Id.*

Hogan wrote again in March, 1995, stating that the agreement between HIP and the Group specifically required that board certification be attained through the ABMS or the AOBMS, and that HIP does

---

**2.** Specifically, the predecessor groups were the East Nassau Medical Group, the Nassau Queens Medical Group, P.C., and LaGuardia Medical Group, P.C. *Id.*

**3.** Although there is some dispute about when Carr first responded to Hogan's December, 1994 letter, *see* HIP Mot. Exs. 5–6, its resolution is not necessary to the outcome of the pending motions.

not recognize the American Board of Clinical Orthopaedic Surgery as a certifying body. *Id.*, Ex. 6. He did, however, recognize Carr's expressed intention to sit for the ABMS boards ("Specialty Boards") and extended to Carr the opportunity to continue his relationship with HIP so long as he passed the July 1995 Specialty Boards and provided adequate documentation. *Id.* Two months later, Hogan confirmed by letter that Carr's appointment would be effective through November, 1995 and that his future status was contingent on Carr achieving ABMS Board Certification. *Id.*, Ex. 7.[4] Carr signed and dated the bottom portion of this letter, marked "Board Certification Required" on June 19, 1995. *Id.*[5]

On December 4, 1995, Carr informed Hogan by letter that he failed the July 1995 exam "by a few points" and offered to retake the exam in July of 1996. *Id.*, Ex. 9. Hogan responded by sending a certified letter, January 2, 1996, *id.*, Ex. 10, which "informed Dr. Carr that he no longer would be allowed to provide care for patients within the HIP system ... because he was not board certified in his specialty." Pl. 56.1 ¶ 8. HIP extended Carr's appointment through April 1, 1996 "to allow for a smooth transition of patient care." HIP Mot. Ex. 10.

Sabet followed up with a letter on behalf of the Group on February 29, 1996, *id.* Ex. 11, which "informed Dr. Carr that his employment with the [ ] Group would be terminated ... because he no longer could treat HIP patients." Pl. 56.1 ¶ 10. Specifically, Sabet informed Carr that a meeting of the Group's board of directors would be held on March 18, 1996, and that he would have the opportunity to have an attorney present and to state his position, and then to appeal any decision of the board as provided in the Group's Shareholder–Employee Agreement. HIP Mot. Ex. 11. Sabet reminded Carr that the agreement "states that if a Shareholder is disapproved by HIP's Medical Control Board," that the disqualified shareholder's agreement with the Group and his employment "shall be automatically terminated." *Id.*

Carr alleges that at sometime thereafter, he "asked both Dr. Sabet and Dr. Hogan if he could contract with both 'the Group' and HIP as an independent doctor, meaning a physician that was a non-member of 'the Group,' and continue to be referred HIP patients from 'the Group'" even "without board certification." Pl. 56.1 ¶¶ 11, 19. He further alleges that both Sabet and Hogan gave him negative responses "sometime between January 1996 and mid-March 1996." *Id.* ¶¶ 12, 20, 24.[6] Carr now alleges that at the time of that request, both were aware that, unbeknownst to Carr, a Dr. Donald Kastenbaum ("Kastenbaum"), a Caucasian, was working for the Group as an independent physician, and treating HIP patients although he had not been board certified and was not a physician member of the Group. *Id.* ¶¶ 13–18. Kastenbaum had been credentialed by HIP under the status of "consulting specialist." Def. 56.1 ¶ 23. Carr maintains that the status of "consulting specialist" that was denied to him even though he was similarly situated to Kastenbaum. Pl. 56.1 ¶¶ 21–25.

On March 15, 1996, shortly before the Group's scheduled board meeting, Carr commenced an action against both HIP and the Group in New York County Supreme Court, requesting that the court grant a preliminary injunction enjoining

---

**4.** In total, defendants gave Carr over ten years, from July of 1985 to November of 1995, in which to become board certified by either the ABMS or the AOBMS.

**5.** In July, September, and November of 1995, Hogan sent additional letters to Carr reminding him of his need to forward documentation confirming his Board Certification. *Id.*, Ex. 8.

**6.** Sabet did send Carr a letter April 2, 1996, informing him that the Group's board did, in fact, pass a resolution terminating his employment as provided in the Shareholder–Employee Agreement. HIP Mot. Ex. 11.

the defendants "from terminating plaintiff's employment with [the Group] or his ability to provide medical services to patients insured by" HIP. HIP Mot. Ex. 12. Carr's action was nominally grounded in contract law and sought a declaratory judgment that his board certification from American Board of Clinical Orthopaedic Surgery served to fulfill his requirements under the Shareholder–Employee Agreement. *Id.*

However, in the papers that Carr presented to the court in support of his motion for a preliminary injunction, Carr argued that he was "not the only physician in [the Group] who is not ABMS certified." Affidavit of Frank H. Carr, dated Mar. 28, 1996, ¶ 15. In fact, he took the position that he was being differentially treated from other non-board-certified physicians whom he alleged were employed by the Group and were allowed to treat patients insured by HIP. *Id.* Carr even attached a list of the names of 13 such physicians. *Id.*

On July 15, 1996, Justice Charles E. Ramos denied Carr's motion for a preliminary injunction. HIP Mot. Ex. 14. Justice Ramos specifically found that "no ambiguity [in the Shareholder–Employee Agreement] exists and a strong argument can be made that the parties intended that plaintiff become board certified by the ABMS, or else he would lose approval by [HIP]." *Id.* Without reaching a final decision on the claim, Justice Ramos rejected the preliminary injunction because of plaintiff's inability to demonstrate a likelihood of success on the merits. *Id.* He opined, "the court cannot avoid noting that, after ten years of practice, the standard qualifications for physicians treating [HIP] patients was something allegedly not known by plaintiff. It is that which will cause damage to plaintiff's professional reputation, not the denial of injunctive relief." *Id.*

Carr filed a notice of appeal of Justice Ramos's decision on July 26, 1996. HIP Mot. Ex. 15. In his supporting papers, Carr expanded on his argument that he had been differentially treated. Affidavit of Frank H. Carr, dated July 26, 1996 ¶¶ 5–6, 8, 10; Affidavit of Frank H. Carr, dated Aug. 16, 1996 ¶¶ 4, 12–14. Specifically, he provided a list of 53 other physicians whom he alleged were able to treat HIP patients through the Group despite a lack of board certification. Plaintiff's July 26, 1996 New York Co. Supreme Court Notice of Appeal, Ex. G.[7] Carr's appeal was summarily denied. HIP Mot. Ex. 19. Defendants subsequently moved for summary judgment, a motion that was granted on a default basis on March 13, 1998. *Id.* Ex. 20. Judgment was entered against Carr five days later. *Id.*

Carr alleges that around the same time his state suit against HIP and the Group was being dismissed, he spoke to Dr. Gene Schwab ("Schwab"), who was affiliated with the Group. According to Carr, it was not until that conversation, in March or April of 1998, that he learned that Kastenbaum had been allowed to receive work through the Group without board certification, as opposed to the other 57 allegedly differentially treated physicians, under the status of "independent consulting specialist." Affidavit of Frank H. Carr, dated Mar. 6, 2000 ("Carr Mar. 6 Aff.") ¶ 30. Carr further alleges that Schwab told him that the special status of "independent consulting specialist" was deliberately concealed from him. *Id.* ¶ 31. He maintains that he subsequently applied for the position of "consulting specialist," but was denied. *Id.* ¶ 27. Carr did not identify to whom he allegedly applied, *see id.*, and both defendants vigorously deny that the application was ever made. Def. 56.1 ¶ 24.

7. Plaintiff's list of 53 physicians submitted in support of his appeal of Judge Ramos's decision included some of same names listed among the 13 names in his preceding submission. Combining the two lists and adjusting for repeated names, Carr named 57 "differentially treated" physicians over the course of the state litigation. Of these, 52 fell within a racial classification other than African–American. Def. 56.1 ¶ 16.

At some point in early 1999, Carr alleges that yet another member of the Group, Dr. Jimmy Lim ("Lim") approached him "about returning to 'the Group' and HIP." *Id.* ¶ 34. Apparently, HIP did repeal the Speciality Board certification requirement for affiliated physicians in 1998. Defendant HIP's Memorandum of Law in Support of its Motion for summary judgment ("HIP Mem.") at 3. According to Carr, Lim discouraged him from applying for his old position, and told him that the only way that he "could come back to 'the Group' and HIP [was] if [he] stopped complaining about racial discrimination." Carr Mar. 6 Aff. ¶ 36. Carr states that, despite this "discouragement," he asked Lim to find out if the Group would accept his application to rejoin the group under HIP's newly relaxed policy concerning board certification, but was told by Lim that Sabet said he would not be taken back unless he dropped his plans to file the instant lawsuit. *Id.* ¶¶ 37–38. Again, defendants deny that Carr ever applied for reinstatement to the group. Def. 56.1 ¶ 20.

Plaintiff filed the instant suit on May 20, 1999. In it, he reasserts many of the same factual allegations of disparate treatment as were used in support of his 1996 state contract action, now in support of claims under federal, state and city civil rights provisions. However, as plaintiff makes clear in his brief, this action does not challenge his 1996 decertification and dis-

missal. Plaintiff's Memorandum of Law in opposition to Defendants' Motions for Summary Judgment ("Pl.Mem.") at 1. Instead, plaintiff's current claims can be summarized as follows: First, he alleges that he was subjected to racial discrimination in 1996 when he was denied the opportunity to apply for the position of "consulting specialist" (the "1996 claim").[8] Second, he alleges that he was subject to racial and retaliatory discrimination in 1998, when he did allegedly apply to be a "consulting specialist" (the "1998 claim"). Third, he alleges that he was subjected to retaliation yet again when his alleged application for reinstatement to the Group was rejected in 1999 (the "1999 claim").

All parties appeared before the Court for a conference on December 15, 1999. At that conference, defendants requested permission to move for summary judgment on the grounds of *res judicata* and the applicable statute of limitations. Plaintiff emphatically argued that he should be allowed to pursue discovery before any such motion was made.[9] Based on the representation of defense counsel that case law supported a dispositive motion at this stage, we granted defendants permission to bring a pre-discovery summary judgment motion, but reminded plaintiff's counsel of his option to seek discovery in the context of Rule 56. In response, plaintiff brought his motion for further discovery under Rule 56(f).[10] We now address these motions.

---

8. Plaintiff seeks to distinguish the rest of his 1996 "contract" claim on essentially 2 bases: (1) legal, that his new claim is based in civil rights law rather than contract law and (2) factual, because of alleged previous inability to apply for the status of "consulting specialist."

9. In this regard, we note that counsel for the Group and Sabet seriously misstate the record in their briefs when they imply that plaintiff made a "conscious decision not to seek discovery." Reply Memorandum of Law in Further Support of the Motion for Summary Judgment by Defendants Queens–Long Island Medical Group, P.C. and Reza Sabet at 10. To the contrary, counsel for plaintiff made

repeated and animated demands that discovery proceed before defendant's proposed motion, in the presence of defendants' counsel.

10. Rule 56(f) provides as follows: "Should it appear from the affidavits of a party opposing the [summary judgment] motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just." As is required by Rule 56(f), *see Gurary v. Winehouse*, 190 F.3d 37, 43–44 (2d Cir.1999), plaintiff has submitted an affidavit (or, more accurately, a decla-

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is properly granted " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law.' " *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 57 (2d Cir.1997) (quoting Fed.R.Civ.P. 56(c)). The Federal Rules of Civil Procedure mandate the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In reviewing the record, we must assess the evidence "in the light most favorable to the non-movant and ... draw all reasonable inferences in its favor." *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.,* 902 F.2d 174, 177 (2d Cir.1990). The mere existence, however, of an alleged factual dispute between the parties will not defeat a motion for summary judgment. In order to defeat such a motion, the non-moving party must affirmatively set forth facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505 (internal quotation omitted).

In considering this summary judgment motion, we are mindful that summary judgment is "ordinarily inappropriate" in the context of a discrimination case because the allegations usually require an exploration into an employer's true motivation and intent for making a particular employment decision. *Patrick v. LeFevre,* 745 F.2d 153, 159 (2d Cir.1984).

At the same time, the "impression that summary judgment is unavailable to defendants in discrimination cases in unsupportable." *McLee v. Chrysler Corp.,* 38 F.3d 67, 68 (2d Cir.1994). Plaintiff is not absolved of the responsibility of producing sufficient evidence from which a reasonable juror could return a verdict in her favor. *See Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505; *Lipton v. Nature Co.,* 71 F.3d 464, 469 (2d Cir.1995) (finding that mere speculation or conjecture as to the true nature of the facts cannot overcome a motion for summary judgment); *Ricks v. Conde Nast Publications, Inc.,* 92 F.Supp.2d 338, 343–44 (S.D.N.Y.2000) (same).

### II. *Res Judicata*

In this case, defendants argue that plaintiff's 1996 claim must be dismissed based on the doctrine of *res judicata,* or claim preclusion.

■ "*Res judicata* makes a final, valid judgment conclusive on the parties, and those in privity with them, as to all matters, fact and law that were or should have been adjudicated in the proceeding." *Waldman v. Village of Kiryas Joel,* 207 F.3d 105, 108 (2d Cir.2000) (quoting Wm. James Moore, *Moore's Federal Practice* ¶ 0.405[1], at III–7 (2d ed.1996)). It precludes the parties or their privies from relitigating issues that could have been raised. *St. Pierre v. Dyer,* 208 F.3d 394, 399–400 (2d Cir.2000) (citing *Federated Dept. Stores, Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981)).

ration) that in very broad outlines purports to show what facts he seeks to obtain, how they are to be obtained, and how those facts create a genuine issue of material fact. Declaration of Stephen T. Mitchell, dated Mar. 14, 2000 ("Mitchell Dec."). Although the declaration does not spell out what effort plaintiff has made to obtain these facts and why the affiant was unsuccessful, *see Gurary, supra,* this deficiency, as a purely procedural matter, is forgivable under the particular circumstances of this case, given that formal discovery was stayed despite plaintiff's repeated protestations to the contrary.

In order to decide whether a suit is barred by *res judicata*, a court must determine whether the second suit involves the same "claim," or "nucleus of operative fact" as the first suit. *Waldman*, 207 F.3d at 108 (citing *Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 90 (2d Cir.1997)). In *Monahan*, 214 F.3d at 285, the Second Circuit described a three part test to prove the affirmative defense. To meet the test, a party must show that "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Id.* (citing *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980)).

The first and second elements of this test are easily met here.[11] The third element proves to be the crux of the *res judicata* determination. The Second Circuit has described the indicia that are crucial to this determination. *Waldman*, 207 F.3d at 108. "To ascertain whether two actions spring from the same 'transaction' or 'claim,' we look to whether the underlying facts are 'related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations.'" *Id.*

Here, it can hardly be doubted that plaintiff's 1996 claim springs from the same triable group of underlying facts as his previous state action. The papers Carr submitted in support of his 1996 action clearly show that he was aware at least 57 other doctors were allegedly being treated differently than he was. Had plaintiff pur-

sued his state action, and not defaulted on it once he was denied preliminary relief, he would have been entitled to explore the reasons that he was allegedly being treated differently than the 57 other doctors. As a result, the motivation for this alleged differential treatment should have been adjudicated in the prior proceeding. The fact that in 1996, plaintiff brought a contract action, and now he brings a race discrimination action is immaterial. *See id.* at 110 (noting that "a plaintiff cannot avoid the effects of *res judicata* by 'splitting' his claim into various suits, based on different legal theories"). Both claims raise questions "related in time, space, origin, [and] motivation, [and] they form a convenient trial unit."

Plaintiff's argument that summary judgment is improper because he needs to pursue additional discovery as to Dr. Kastenbaum and the position of "consulting specialist" is also misplaced. Even assuming that plaintiff subsequently learned of a fifty-eighth doctor who was allegedly treated differentially, it cannot excuse the fact that he never pursued his claims against defendants to explore their motivation for the differential treatment of the other 57. "[T]he facts essential to the barred second suit need not be the same as the facts that were necessary to the first suit. It is instead enough that 'the facts essential to the second were [already] present in the first.'" *Id.* at 110–11 (quoting *Computer Assoc. Int'l, Inc. v. Altai, Inc.*, 126 F.3d 365, 369 (2d Cir.1997)). Here, the essential facts of plaintiff's 1996 claim, his alleged differential treatment at the hands of defendants, were indeed present in the 1996 state action.[12] As a result, summary

---

11. First, under New York law, a grant of summary judgment does constitute an adjudication "on the merits." *Strange v. Montefiore Hosp. and Med. Ctr.*, 59 N.Y.2d 737, 738–39, 463 N.Y.S.2d 429, 450 N.E.2d 235 (1983). Second, the 1996 state action was brought by the same plaintiff against the same defendants with the exception of Sabet. However, since Sabet was the President and Medical Director of the Group during all times relevant to this action, she was "known by [Carr] at the time

of the first suit," and she "has a sufficiently close relationship to [the Group] to justify preclusion." *Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 367–69 (2d Cir.1995). As a result, she is in privity with the other defendants.

12. Further, the majority of the facts sought to be obtained in plaintiff's 56(f) submission, *see* Mitchell Dec. ¶¶ 9–11, 14–21, cannot raise a genuine issue of material fact, since they can-

judgment on plaintiff's 1996 claim is properly granted.

■ Nevertheless, plaintiff's 1998 and 1999 claims cannot be precluded by the prior action. It is axiomatic that the doctrine of res judicata " 'cannot be given the effect of extinguishing claims which did not [previously] exist and which could not possibly have been sued upon in the previous case.' " St. Pierre, 208 F.3d at 399–400 (quoting Lawlor v. National Screen Serv. Corp., 349 U.S. 322, 328, 75 S.Ct. 865, 99 L.Ed. 1122 (1955)). Since plaintiff alleges that he was rejected by HIP and the Group again in 1998 and 1999, these claims only accrued after the 1996 state court litigation was complete, and they cannot be precluded by the prior action. To the extent that defendants' motion seeks to bar these claims on the ground of res judicata, such motion must be denied.

### III. Statute of Limitations

■ For similar reasons, plaintiff's 1996 claim must also be dismissed because the operative statute of limitations has run. Here, it is undisputed that the operative time limit for plaintiff's claims under 42 U.S.C. § 1981 and the related state causes of action is three years. See Pl. Mem. at 12; Group Mem.[13] at 12; HIP Mem. at 12 (all citing, inter alia, Graaf v. North Shore Univ. Hosp., 1 F.Supp.2d 318, 323 (S.D.N.Y.1998)). See also Wilson v. Fairchild Republic Co., 143 F.3d 733, 738 n. 5 (2d Cir.1998) (section 1981); Koerner v. State, Pilgrim Psychiatric Center, 62 N.Y.2d 442, 446, 478 N.Y.S.2d 584, 467

N.E.2d 232 (1984) (New York State discrimination law); N.Y.C. Admin. Code § 8–502(d) (New York City provision). A discrimination claim accrues when the plaintiff "knows or has reason to know" of the injury that constitutes the basis of the action. Morse v. University of Vermont, 973 F.2d 122, 125 (2d Cir.1992). The Supreme Court has held that the proper focus in determining the accrual date of a cause of action for employment discrimination is "the time of the discriminatory acts, not upon the time at which the consequences became most painful." Delaware State College v. Ricks, 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). Thus, the last date of employment may not always coincide with the start of the statutory limitation clock. Here, giving plaintiff the most generous assumption possible, his 1996 claim accrued at the very latest shortly after April 2, 1996, when he received Sabet's letter informing of him of the Group's formal decision to terminate him under the Shareholder–Employee Agreement.[14] Plaintiff brought this claim in May of 1999, more than three years later.

■ Plaintiff alleges that his failure to file the instant suit within the three year time period should be forgiven on a theory of equitable tolling. The essence of the doctrine of equitable tolling is that a statute of limitations does not run against a plaintiff who is unaware of his cause of action. See Dillman v. Combustion Engineering, Inc., 784 F.2d 57, 60 (2d Cir.1986) (quotation omitted).[15] The doctrine may

---

not disprove the existence of essential facts in the first action and consequently would not affect the outcome of this aspect of the summary judgment motion. See, e.g., Demery v. Extebank Deferred Compensation Plan (B), 216 F.3d 283, 286 (2d Cir.2000) (affirming summary judgment where plaintiff's 56(f) affidavit fails to raise an issue of material fact); Wedeen v. Cooper, No. 97 Civ. 8621, 1998 WL 391117, *5 (S.D.N.Y. July 14, 1998) (denying a motion under Rule 56(f) where "the claims dismissed [ ] all suffer from defects that could not have been cured by [additional] evidence").

13. "Group Mem." refers to the Memorandum of Law in Support of Motion for Summary Judgment by Defendants Queens–Long Island Medical Group, P.C. and Reza Sabet, M.D.

14. However, we make no specific finding that it is, in fact, correct to start counting the statute of limitations from this late date.

15. See also Corcoran v. New York Power Auth., 202 F.3d 530, 543–44 (2d Cir.1999) ("Under federal common law, a statute of limitations may be tolled due to the defendants' fraudulent concealment if the plaintiff establishes

be invoked where defendants' actions are responsible for plaintiff's unawareness or where plaintiff is "prevented in some extraordinary way from exercising his rights." *Cerbone v. International Ladies' Garment Workers' Union,* 768 F.2d 45, 48–49 (2d Cir.1985) (quotation omitted). Here, plaintiff was not only aware of his cause of action, he actively pursued it in state court. Even assuming some of the significance plaintiff ascribes to his alleged 1998 discovery of the status of "independent consulting physician," he would easily have learned of it in the course of discovery had he elected to pursue the state action. His decision to default that action (and perhaps to engage in forum shopping) cannot be ascribed to defendants.[16] As a result, summary judgment must also be granted against plaintiff's 1996 claim on statute of limitations grounds as well.

## IV. Failure to State a Claim

Defendants also ask this court to grant summary judgment against plaintiff's 1998 and 1999 claims on the basis of his alleged failure to state a claim for which relief may

be granted. Plaintiff, again, cross-moves this Court to allow discovery under Rule 56(f) of the Federal Rules of Civil Procedure.

 In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the United States Supreme Court articulated a three-step burden shifting analysis which courts must apply when analyzing discrimination and retaliation claims. This analysis was recently revisited by the Supreme Court in *Reeves v. Sanderson Plumbing Products, Inc.,* —— U.S. ——, ——–——, 120 S.Ct. 2097, 2105–06, 147 L.Ed.2d 105 (2000).[17]

First, the plaintiff must establish a *prima facie* case of either retaliation or discrimination. *See McDonnell Douglas,* 411 U.S. at 802–04, 93 S.Ct. 1817. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment decision. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817;

that: (1) the defendant wrongfully concealed material facts related to the defendant's wrongdoing; (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3) plaintiff exercised due diligence in pursuing discovery of the claim during the period plaintiff seeks to have tolled.") (internal quotation marks and citation omitted).

**16.** Moreover, courts have held the doctrine of equitable tolling "does not permit plaintiffs to suspend the time for filing discrimination complaints indefinitely when they discover instances of disparate treatment of other employees months or years after their discharge. It is to be expected that some relevant facts will come to light after the date of an employee's termination—one purpose of [pursuing legal recourse] is to uncover them. The requirement of diligent inquiry imposes an affirmative duty on the potential plaintiff to proceed with reasonable investigation in response to an adverse event." *Jones v. Long Island R. Co.,* No. 96 Civ. 0433, 1998 WL 221365, *3–4 (E.D.N.Y. May 1, 1998) (quoting *Pacheco v. Rice,* 966 F.2d 904, 907 (5th Cir. 1992)). Here, Carr's decision to default on his own state litigation without pursuing discovery cannot, as a matter of law, comport

with a duty "to proceed with reasonable investigation." *See also Strachova v. Metropolitan Museum of Art,* No. 98 Civ. 8505, 1999 WL 566305, *6 (S.D.N.Y. Aug. 3, 1999) (finding equitable tolling to be inappropriate in cases in which plaintiff failed to act diligently in asserting his or her claim).

**17.** We evaluate retaliation claims under the same burden shifting rules as used in race discrimination cases under *McDonnell Douglas,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668. *See Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 443 (2d Cir.1999). This is the case even where plaintiff's claim is brought under section 1981, rather than Title VII. *See Cruse v. G&J USA Publishing,* 96 F.Supp.2d 320, 327 (S.D.N.Y. 2000); *Fowler v. Transit Supervisors Org.,* No. 96 Civ. 6796, 2000 WL 303283, *5 (S.D.N.Y. Mar. 23, 2000). Further, "[o]ur consideration of claims brought under the state and city human rights laws [also] parallels the analysis used in Title VII claims." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 565 n. 1 (2d Cir.2000) (citing *Leopold v. Baccarat, Inc.,* 174 F.3d 261, 264, n. 1 (2d Cir.1999)).

*Cruz,* 202 F.3d at 567. If the defendant is able to provide evidence of a nondiscriminatory basis for the discharge, then the presumption of discrimination "simply drops out of the picture" and the burden once again shifts to the plaintiff to demonstrate, by a preponderance of the evidence, that the employer's presumptively valid explanation was merely a pretext for discrimination or retaliation. *Reeves,* —— U.S. at —— – ——, 120 S.Ct. at 2105–06 (citing, *inter alia, St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 510–511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). *See also McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817.

The prima facie case of racial discrimination consists of plaintiff's showing of (1) "membership in a protected class," (2) "qualification for the position [held]," (3) "adverse employment action," and (4) "circumstances giving rise to an inference of discrimination." *Cruz,* 202 F.3d at 567. *See also Reeves,* —— U.S. at —— – ——, 120 S.Ct. at 2105–06.

A *prima facie* case of retaliation under Title VII requires a showing that: (1) the employee was engaged in an activity protected under Title VII; (2) the employer was aware of the plaintiff's participation in the protected activity; (3) there was an employment action that disadvantaged the plaintiff; and (4) there was a causal connection between the employee's protected activity and the adverse action taken by the employer. *See Cruz,* 202 F.3d at 566;

*Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir.1995); *Ricks,* 92 F.Supp.2d at 344–45.

■ Although the burden of passing this *prima facie* test has been described as "minimal," it is nonetheless a real requirement that can lead to dismissal if not met. We focus on the third and fourth elements of both cases: the adverse employment action; and the circumstances giving rise to the inference of the prohibited motive.[18] As a matter of logic, plaintiff must sufficiently allege the third element, that he actually suffered some kind of employment action, in order to establish the fourth, the prohibited motive for that action. A plaintiff can satisfy this third element by making a showing that he applied for the subject position, but was rejected. *See Chertkova v. Connecticut Gen. Life Ins. Co.,* 92 F.3d 81, 87–91 (2d Cir. 1996). Further, the Second Circuit recently made it clear that a "claim of refusal to rehire an individual following the filing of an employment discrimination charge may be a basis for a claim of retaliation." *Weissman v. Dawn Joy Fashions, Inc.,* 214 F.3d 224, 234 (2d Cir. 2000) (citing *Veprinsky v. Fluor Daniel, Inc.,* 87 F.3d 881, 893 (7th Cir.1996)).

Here, plaintiff's factual allegation with respect to the adverse employment component of his 1998 claim is altogether vague. In its entirety, it consists of the following sentence: "I applied for the consulting specialist position was qualified for it, and

18. We note that, for the purpose of summary judgment, plaintiff easily fulfills the correlating first element of each of these *prima facie* cases in that he is both: a member of a protected class in that he is African–American and was arguably engaged in a protected activity under Title VII. Title VII defines protected activities as: (1) an employee's opposition to any activity which is prohibited by Title VII, or (2) an employee's participation in any Title VII investigation or proceeding. *See Ricks,* 92 F.Supp.2d at 345 (citing *Gilani v. National Ass'n of Sec. Dealers, Inc.,* No. 96 Civ. 8070, 1997 WL 473383, *7 (S.D.N.Y. Aug. 19, 1997)). Inasmuch as plaintiff acted in way opposed to discriminatory treatment, such behavior constitutes protected activity.

*Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 465–66 (2d Cir.1997). A plaintiff need not show that his discrimination claim was itself valid in order to prevail against a defendant for retaliating against him for making the complaint. *Sumner v. United States Postal Serv.,* 899 F.2d 203, 208–09 (2d Cir.1990). Here it is enough that plaintiff alleges that defendants were aware of his complaints of discriminatory treatment, his actual 1996 suit, and his contemplation of bringing the present action. Also, for the purposes of this motion, we assume that plaintiff can make a showing that he is qualified to reapply for HIP and the Group given that HIP apparently no longer requires the prerequisite of Specialty Board certification.

was denied the opportunity because of my race." Carr Mar. 6 Aff. ¶ 27. Carr, who presumably would be in the best position to know, does not assert when he applied, to whom he applied, what were the circumstances of his application, or how he was notified of his rejection.[19] Given the lack of specificity attached to this statement, this is no more than a "conclusory allegation," insufficient to defeat summary judgment with or without discovery. *See Bickerstaff v. Vassar College,* 196 F.3d 435, 451–52 (2d Cir.1999) (restating principle that to defeat summary judgment, plaintiffs' "affidavits must be based upon concrete particulars, not conclusory allegations") (citing, *inter alia, BellSouth Telecommunications, Inc. v. W.R. Grace & Co.–Conn.,* 77 F.3d 603, 615 (2d Cir.1996)); *Ricks,* 92 F.Supp.2d at 346–47 (basing grant of summary judgment for defendant in Title VII case, in part, on plaintiff's reliance on conclusory allegations to rebut defendants' specific evidence); *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all [discrimination] cases").[20]

On the other hand, plaintiff's allegations with respect to the adverse employment aspect of his 1999 claim are somewhat more specific. In its entirety, it consist of the following set of statements:

> I was approached by Dr. Jimmy Lim about returning to "the Group" and HIP in early 1999. I told Dr. Lim that I would like to apply for my old position and sought to apply. Dr. Lim discouraged my application by telling me that I could come back to the "Group" anf HIP only if I stopped complaining about racial discrimination. I told Dr. Lim that I wanted to apply none the less [sic] and I asked Dr. Lim to find out if "the Group" and HIP would accept my application. I was told by Dr. Lim that Dr. Sabet said that my application for reinstatement would be rejected and I would not be taken back into either HIP or "the Group" unless I dropped my plans to file a racial discrimination lawsuit. After this lawsuit was filed Dr. Lim told me that Dr. Sabet said that if I dropped this lawsuit and stopped complaining about racial discrimination that HIP and "the Group" would accept my application and I would be reinstated to his [sic] old position. I asked Dr. Lim to furnish me with the materials and information I needed to reapply for my old position but the materials and information never were furnished by Dr. Lim.

Carr Mar. 6 Aff. ¶¶ 34–39.

Defendant takes the position that Carr never did, in fact, apply for reinstatement to the Group. Def. 56.1 ¶ 19. However, given that the parties have not engaged in any discovery as to this crucial factual predicate to plaintiff's claim, we have determined that summary judgment, at this juncture, would be premature, at least with respect to plaintiff's 1999 retaliation claim. *See Berger v. United States,* 87 F.3d 60, 65 (2d Cir.1996) (reversing summary judgment where "the district court did not wait until 'after discovery' to grant summary judgment"). With regard to plaintiff's 1999 claim, we cannot conclude that plaintiff has been dilatory in seeking

---

**19.** It is worth noting that we were able to discern that this allegation dates to 1998 only because Carr could not have applied for the "consulting specialist" position until after he had learned of it, which he alleges took place in 1998. *Id.* ¶ 30.

**20.** *See also Feeley v. Whitman Corp.,* 65 F.Supp.2d 164, 172 (S.D.N.Y.1999) (granting a pre-discovery summary judgment motion, and denying an opposing 56(f) motion where

the needed supporting facts "are clearly within the knowledge of the plaintiff, requiring no discovery"); *Wedeen,* 1998 WL 391117, at *5 (similarly granting summary judgment before discovery and rejecting a 56(f) application where the claim "suffer[ed] from defects that could have been cured by evidence that is already completely within the control of the plaintiff").

discovery. *See Robinson v. Transworld Airlines, Inc.,* 947 F.2d 40, 43 (2d Cir. 1991). We note however, that it is an open question as to whether Carr's interactions with Lim can constitute an adverse employment action for the purposes of plaintiff's case. We have merely determined that, in our discretion, we believe it prudent to allow discovery on this question before making a final ruling on summary judgment.

At this time, this is the only discovery that we are permitting. Once discovery on the adverse employment action question is completed, we will entertain an appropriate summary judgment motion directed to this discrete issue. Assuming that plaintiff survives such motion, we will allow broader discovery on the issue of whether plaintiff's "rejection" was causally related to his protected activities.

### CONCLUSION

For the foregoing reasons, defendants' motions for summary judgment are granted inasmuch as they apply to plaintiff's 1996 and 1998 claims. Conversely, plaintiff's motion for further discovery on the 1996 and 1998 claims are denied. At the same time, defendants' motions for summary judgment are denied as they relate to plaintiff's 1999 claim without prejudice to their renewal following discovery. Plaintiff's motion for additional discovery as applied to the 1999 claim is accordingly granted.

Therefore, we order limited discovery, as set forth in paragraph 22 of the Mitchell Declaration, on the issue of whether Carr, as alleged, actually applied to be reinstated as a member of the Group in 1999. All discovery in this regard is to be completed no later than November 15, 2000. Counsel are directed to appear for a conference with the Court at 10:00 a.m. on November 20, 2000 at the United States Courthouse, 500 Pearl Street, New York, New York in Courtroom 21A. Counsel should have authority to fully discuss all aspects of the litigation.

**IT IS SO ORDERED.**