Aminah **RICKS**, Plaintiff,

v.

**CONDE NAST PUBLICATIONS, INC.,**
**Alexandra Golinkin, Julie Krumholz,**
**and Wendy Cohen, Defendants.**

No. 98 Civ. 7485 (RWS).

United States District Court,
S.D. New York.

April 25, 2000.

Winston & Parker, New York City, Sandra D. Parker, of counsel, for Plaintiff.

Littler Mendelson, New York City, Richard L. Hartz, Domenique Camacho, of counsel, for Defendants.

## OPINION

SWEET, District Judge.

Defendants Conde Nast Publications Inc. ("Conde Nast"), Alexandra Golinkin ("Golinkin"), Julie Krumholz ("Krumholz"), and Wendy Cohen ("Cohen") have moved pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment to dismiss the complaint of plaintiff Aminah Ricks ("Ricks") alleging racial discrimination, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII") and 42 U.S.C. § 1981 ("Section 1981"). For the reasons set forth below, the motion is granted.

### The Parties

Ricks, an African–American, was employed by Conde Nast as an Account Manager for Allure Magazine from July 14, 1997 until October 14, 1997.

Conde Nast is a corporation that maintains offices in New York City and is engaged in the business of publishing magazines, including Allure Magazine.

Golinkin was the publisher of Allure Magazine from May 1993 through October 1998.

Krumholz was employed by Allure Magazine from on or about March 1997 through April 1998, during which period she was responsible for the advertising positioning and layout of the magazine.

Cohen was the national sales director for Conde Nast in the New York office and was responsible for managing account managers in the five regional sales offices from April through October 1997.

### Prior Proceedings

Ricks commenced this action asserting claims for race discrimination, hostile work environment and retaliation under Title VII and Section 1981 on October 22, 1998, having previously filed a charge of discrimination by the defendants with the Equal Employment Opportunity Commission ("EEOC") on September 26, 1997.

Ricks' complaint alleges that her termination was motivated by race discrimination; that she was subjected to racial harassment that created a hostile work environment; and that she was terminated as retaliation for protesting her employer's discriminatory practices. All of these claims are brought pursuant to both Title VII and Section 1981.

The parties engaged in comprehensive discovery, exchanged hundreds of pages of documents and deposed six witnesses. The instant motion was heard and marked fully submitted on January 19, 2000.

### Facts

The facts set forth below are taken from the parties' Rule 56.1 statements, affidavits, and exhibits. What follows is gleaned from these submissions, with any factual inferences drawn in Ricks' favor.

In 1996, Ricks submitted an application to the Conde Nast Human Resources Department for an account manager position. In May 1997, Sandra Stock ("Stock"), Human Resources Manager for Conde Nast, contacted Ricks concerning a vacant account manager position at Allure Magazine. At the time Stock contacted her, Ricks was working as an account manager at Heart & Soul Magazine, published by Rodale Press.

Account managers are responsible for selling advertising pages in the magazine to advertisers or advertising agencies. Among other duties, account managers must articulate the editorial mission of the magazine to clients and potential clients and persuade them to place advertising in the magazine through letters, promotional materials, phone calls, and meetings.

Prior to working for Allure, Ricks had about one year's experience in advertising. Stock told Ricks that Conde Nast did not generally interview candidates with less

than three years' experience, but nonetheless set up a meeting with Krumholz.

Following Ricks' interview with Krumholz, the Allure advertising director at that time, Nada Stirrat ("Stirrat"), called Ricks for a meeting and requested that she prepare a mock sales presentation. Following her interview with Stirrat, Ricks interviewed with Golinkin in or about June 1997. Ricks was subsequently offered the position of account manager, which she accepted.

Ricks' compensation package did not include a commission. According to Stock, Ricks was not entitled to a commission because she had been hired in the second half of the year. Eric Wirth ("Wirth"), a white male, was hired under the title of Beauty Advertising Director on July 22, 1997, and was given certain "guaranteed [ ] supplementary" compensation which some documents refer to as a commission.

During the period of Ricks employment at Allure, she was the only African–American account manager.

Ricks began work as an Allure Magazine account manager on July 14, 1997. She reported to Stirrat, as well as Krumholz and Golinkin. Stirrat left Allure in or about late July 1997. Ricks then began reporting to Cohen, who had recently joined the New York office, as well as to Krumholz and Golinkin.

Ricks was told she would receive training for her position. Ricks was provided with a calendar of sales calls so that she could accompany other account managers to observe how they carried out their work. She went on approximately three calls. Ricks was also provided with sample letters and presentations. Ricks was not given a job description.

When Ricks began her employment she was given a binder of account information that had been compiled by her predecessor. Ricks began to work on updating the information on the accounts. She had not completed this task when she was terminated.

In or about August 1997, Ricks made a sales call, accompanied by Krumholz, to the Advil advertising agency, to try to convince them to use print advertising even though Advil had abandoned print advertising several years earlier. Krumholz disagreed with this strategy.

Allure developed a plan to generate additional advertising sales for its October issue by offering potential advertisers a merchandising premium incentive. Ricks prepared a letter offering multiple premiums to a single account, although the letter was not sent.

On or about July 28, 1997, Krumholz called Ricks a "bug" that was going to get "squashed," and further told her that she was "wearing out the carpet" in Golinkin's office.

Ricks met on a weekly basis with Krumholz and Cohen regarding her accounts. In August 1997, Krumholz and Cohen asked Ricks to prepare specific reports and summaries regarding her accounts. Cohen told her that she should expect to make some mistakes and that it would take about six months to become really seasoned. In August 1997, Krumholz told Ricks that Golinkin was going to "rip [Ricks] a new a—hole".

On or about August 26, 1997, Cohen and Krumholz met with Ricks and told her that her performance was unsatisfactory, including her ability to articulate the magazine to clients or potential clients, her failure to keep accurate information in her account book, and her arranging of unproductive meetings. They directed her to prepare a "working agreement" outlining what she planned to accomplish within six weeks, and told her that if she failed to accomplish the plan outlined in the working agreement that she would be terminated within six weeks. The "working agreement" was a concept that had been used previously with two other account managers with performance problems, Ashley Lewis and Lauren Hulkhower, who are non-African American females.

Cohen began to accompany Ricks on some sales calls, at Golinkin's request.

On or about August 28, 1997, Ricks set up a meeting to discuss the Playtex account with a person at Grey Advertising. Cohen accompanied her, and on the way back from the meeting Cohen yelled at Ricks and told her that she had not set up the meeting with the correct person. Cohen stated that she wanted to look at Ricks' account book. When they got back to the office, Ricks went to Cohen's office at the appointed time and asked whether it would be more useful to meet about her account book after Ricks had gathered all the information concerning her accounts. Cohen told Ricks to shut up, hit her on the shoulder, and pushed her out of the office.

About a week after the August 26 meeting, Ricks gave Cohen, Krumholz, and Golinkin a memo dated September 2, 1997, outlining the areas she would cover in her working agreement. She then prepared a "Draft Working Agreement" dated September 3, 1997, in which she set forth goals for improving her performance over the next six-week period.

On September 3, Ricks complained to Brenda Selden ("Selden") in the Human Resources Department about Krumholz's comments and Cohen's having hit her on the shoulder. She did not allege that these incidents were racially motivated.

At a staff meeting on an unspecified date, Golinkin made a statement along the lines that Ricks' hair was "different than everybody else's".

In a memo dated September 4, 1997, Cohen told Ricks that she would have to improve her performance or she would be terminated within thirty days. Cohen told Ricks that she was not to go on sales calls without a supervisor because of problems with Ricks' articulation of the magazine and ability to prepare for sales calls.

On September 12, 1997, Ricks' attorney sent a letter to Krumholz alleging that Ricks' civil rights had been violated on the job and asserting that legal action would be taken if this conduct continued.

On September 26, 1997, Ricks filed a charge of unlawful employment discrimination with the EEOC.

Ricks was given final notice in a document dated October 6, 1997 entitled "Performance Review." This document states Ricks had continued to performed deficiently in several areas, including failing to keep her account book updated, scheduling unproductive meetings, and giving out inaccurate information. Ricks responded with a memo dated October 7, 1999, in which she took issue with the various criticisms of her performance.

On October 14, 1997, Ricks was called into Golinkin's office and told that her employment was terminated effective immediately.

Another account manager working at Allure during the time Ricks was there, Jordana Rosenberg ("Rosenberg"), was fired for poor performance several months after Ricks. Wirth, who was also employed in the department at this time and also had performance problems, agreed to resign in December 1997. Neither Rosenberg nor Wirth is African–American.

## DISCUSSION

Conde Nast has moved for summary judgment on the grounds that: (1) Ricks cannot establish a *prima facie* case of race discrimination because she cannot demonstrate that she was qualified for her position nor that the circumstances give rise to an inference of discrimination; (2) Ricks cannot demonstrate that the reason asserted by Conde Nast for terminating her employment is pretextual; (3) Ricks cannot assert a claim under 42 U.S.C. § 1981 because she was an at-will employee; (4) Ricks cannot demonstrate that she was subjected to a hostile work environment; (5) Ricks cannot make out a *prima facie* case of retaliation because she cannot establish causation.

## I.  Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for sum-

mary judgment may be granted when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Second Circuit has repeatedly noted that "as a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988) (*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting)); *see Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Burrell v. City Univ.,* 894 F.Supp. 750, 757 (S.D.N.Y.1995). If, when viewing the evidence produced in the light most favorable to the nonmovant, there is no genuine issue of material fact, then the entry of summary judgment is appropriate. *See Burrell,* 894 F.Supp. at 758 (*citing Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991)).

Materiality is defined by the governing substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985).

For a dispute to be genuine, there must be more than "metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

Additional considerations factor into a summary judgment motion in an employment discrimination action. *See Gallo v. Prudential Residential Services, L.P.,* 22 F.3d 1219, 1224 (2d Cir.1994); *see also Montana v. First Fed. Sav. & Loan Ass'n,* 869 F.2d 100, 103 (2d Cir.1989); *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's documents, a trial court must be particularly cautious about granting summary judgment when the employer's intent is at issue. Affidavits and depositions must be scrutinized for circumstantial evidence which, if believed, would show discrimination. *See Gallo,* 22 F.3d at 1224. This does not suggest, however, that summary judgment is never appropriate in an employment discrimination action. The Second Circuit has made clear that the "impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable." *McLee v. Chrysler Corp.,* 38 F.3d 67, 68 (2d Cir.1994); *see Meiri,* 759 F.2d at 998.

Where no evidence exists or only conclusory allegations of discrimination have been offered to suggest that an employer's motives are improper, summary judgment may be appropriate. *See Meiri,* 759 F.2d at 998; *see also Woroski v. Nashua Corp.,* 31 F.3d 105, 109–10 (2d Cir.1994). After all, a party seeking to defeat a summary judgment motion cannot rely upon "conclusory allegations or denials," but rather must set forth "'concrete particulars'" showing that a trial is needed. *National Union Fire Ins. Co. v. Deloach,* 708 F.Supp. 1371, 1379 (S.D.N.Y.1989) (*quoting R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984)). Mere speculation or conjecture as to the true nature of facts cannot overcome the motion. *See Lipton v. Nature Co.,* 71 F.3d 464, 469 (2d Cir.1995); *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986). The responding party "must show the existence of a disputed material fact in light of the substantive law." *Peer Int'l Corp. v. Luna*

*Records, Inc.,* 887 F.Supp. 560, 564 (S.D.N.Y.1995). In the absence of any disputed material fact, summary judgment is appropriate.

## II. *The Legal Standards Governing Title VII Claims*

### A. *Race Discrimination*

As the Second Circuit has explained, the "ultimate issue" in any employment discrimination case is "whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an 'impermissible reason.'" *Stratton v. Department for the Aging,* 132 F.3d 869, 878 (2d Cir.1997).

Title VII makes it unlawful "for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [ ]." 42 U.S.C. § 2000e–2(a)(1).

The basic framework for Title VII discrimination claims is the three-step burden shifting analysis developed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell,* the plaintiff has the initial burden of establishing a *prima facie* case of unlawful race discrimination by showing that the plaintiff is: (1) a member of a protected class, (2) who was qualified for his position, (3) who suffered an adverse employment action, (4) under circumstances giving rise to an inference of discrimination. *See McDonnell,* 411 U.S. at 802, 93 S.Ct. 1817; *Austin v. Ford Models, Inc.,* 149 F.3d 148, 152 (2d Cir. 1998); *see also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The requirements for establishing a prima facie case are not onerous. *See Hicks,* 509 U.S. at 506, 113 S.Ct. 2742; *Austin,* 149 F.3d at 152.

If a plaintiff makes out a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory purpose for the adverse employment decision. *See McDonnell,* 411 U.S. at 802, 93 S.Ct. 1817; *Austin,* 149 F.3d at 153; *Woroski,* 31 F.3d at 108.

Once the employer articulates such a purpose, the burden shifts back to the plaintiff to show that the "employer's proffered reasons are ... a pretext for discrimination." *Austin,* 149 F.3d at 153 (citations omitted). To make this showing, the plaintiff must demonstrate "*both* that the [proffered] reason was false, *and* that discrimination was the real reason." *Hicks,* 509 U.S. at 515, 113 S.Ct. 2742.

### B. *Retaliation*

■ Title VII also provides that "it shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful practice by this subchapter...." 42 U.S.C. § 2000e–3(a). As the Second Circuit has noted, "[t]he objective of this section is obviously to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice." *Manoharan v. Columbia Univ. College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988). To establish a claim for retaliation pursuant to Title VII, a plaintiff need not prove that her discrimination claim was valid in the first instance. *See Sumner v. United States Postal Serv.,* 899 F.2d 203, 208–09 (2d Cir.1990).

■ A *prima facie* case of retaliation under Title VII requires a showing that (1) the employee was engaged in an activity protected under Title VII; (2) the employer was aware of the plaintiff's participation in the protected activity; (3) there was an employment action that disadvantaged the plaintiff; and (4) there was a causal connection between the employee's protected activity and the adverse action taken by the employer. *See Tomka,* 66 F.3d at 1308; *Malarkey v. Texaco, Inc.,* 983 F.2d 1204, 1213 (2d Cir.1993); *Burrell,* 894 F.Supp. at 760. The requisite causal connection may be established "indirectly by showing that the protected activity was

closely followed in time by the adverse action." *Manoharan*, 842 F.2d at 593 (*citing Davis v. State Univ. of New York*, 802 F.2d 638, 642 (2d Cir.1986)).

If a plaintiff makes such a showing, the burden then shifts to the defendant to articulate some legitimate, non-discriminatory reason for its actions. *See Tomka*, 66 F.3d at 1308. If the defendant carries this burden, the plaintiff then has an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were merely a pretext for retaliation. *See Tomka*, 66 F.3d at 1308.

Title VII defines protected activities as (1) an employee's opposition to any activity which is prohibited by Title VII, or (2) an employee's participation in any Title VII investigation or proceeding. *See Gilani v. National Ass'n of Securities Dealers, Inc.*, No. 96 CV 8070, 1997 WL 473383, at*7 (S.D.N.Y. Aug. 19, 1997) (*citing Williams v. Boorstin*, 663 F.2d 109, 115 (D.C.Cir. 1980)).

### C. *Hostile Work Environment*

An employer will be liable under Title VII for permitting a discriminatory hostile work environment, that is, a "workplace [that is] permeated with discriminatory intimidation, ridicule, and insult ... sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal references omitted); *see Richardson v. New York State Dept. of Correctional Service*, 180 F.3d 426, 436 (2d Cir.1999). "The incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir.1997). Conduct that is "merely offensive, unprofessional or childish is not discriminatory conduct proscribed by Title VII." *Cosgrove v. Federal Home Loan Bank of N.Y.*, No. 90 Civ. 6455, 1999 WL 163218, at *20 (S.D.N.Y. Mar. 23, 1999).

Factors to be considered when determining whether an environment is hostile or abusive include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. 367.

As with a Title VII claim alleging a discriminatory adverse employment decision, a plaintiff in a hostile environment case must demonstrate that there are circumstances giving rise to an inference of discriminatory intent behind the abusive conduct. *See Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80–81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

### III. *Ricks Has Not Presented Triable Issues of Fact With Respect To Her Claims*

#### A. *Disparate Treatment*

■ As explained above, in order to make out a *prima facie* case of discrimination through disparate treatment, Ricks has the initial burden of establishing a *prima facie* case by showing that she: (1) is a member of a protected class, (2) who was qualified for his position, (3) who suffered an adverse employment action, (4) under circumstances giving rise to an inference of discrimination. *See McDonnell*, 411 U.S. at 802, 93 S.Ct. 1817; *Austin*, 149 F.3d at 152.

Ricks satisfies the first and third prongs of the McDonnell test because she is African–American and she was terminated from her employment. She cannot, however, satisfy either the second or fourth prongs of the test. Moreover, even if assuming *arguendo* she were able to establish a *prima facie* case, Conde Nast has articulated a legitimate reason for firing her which Ricks is unable to rebut.

■ Although a plaintiff's burden in establishing a *prima facie* case is *de minimis*, she must do more than make conclusory allegations. With respect to the second prong of the *McDonnell* test, then, Ricks

must offer some evidence from which a reasonable fact-finder could conclude that she was qualified for her position. *See McDonnell,* 411 U.S. at 802, 93 S.Ct. 1817; *Thornley v. Penton Publishing,* 104 F.3d 26, 29 (2d Cir.1997). Ricks acknowledges her prior lack of experience for the position as well as some of the specific deficiencies in her performance pointed to by the defendants. Ricks counters that she was told that she would be provided training and that it would take six months for her to become really seasoned. Ricks cannot prove she is qualified by conceding that she did not have the qualifications for the job and averring merely that she expected to gain them through training.[1] *See Wiseman v. Pratt & Whitney,* 46 F.Supp.2d 115, 118 (D.Conn.1999). Although Ricks alleges that white account managers were given more training than she was, Ricks fails to present any evidence on this point. *Cf. Kohlbrenner v. Victor Belata Belting Co., Inc.,* No. 94–CV–0915E, at *2, 1997 WL 65895 (W.D.N.Y. Feb.11, 1997) (denying summary judgment to employer in Title VII discriminatory promotion case where plaintiff offered evidence of discriminatory training practices).

Finally, Ricks' allegation that she did not receive training is contradicted by her own admissions as to specific training she actually received: initially, by accompanying other account managers on sales calls and being provided with sample letters and presentations; and, once her performance problems began to be of concern to her supervisors, by having a supervisor accompany her on her client visits. Her performance problems continued despite the training she received.

■ Nor can Ricks show that the circumstances of her termination give rise to an inference of discrimination. Although she alleges that she was treated differently and more harshly than poorly performing white account managers in that she was required to develop a "working agreement" and in the fact that she was terminated for poor performance, the record does not support these contentions. There were white account managers who, like Ricks, had been required to prepare a "working agreement" due to their performance problems. Ricks was also not the only employee fired for performance problems. Rosenberg, a white female, was fired several months after Ricks. Wirth, a white male, agreed to resign.[2]

Furthermore, even assuming *arguendo* that Ricks could make out a *prima facie* case, her claim fails because she cannot show that the non-discriminatory reason articulated by Conde Nast for terminating her, i.e., that she failed to perform her job adequately, was pretextual.

■ "[W]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation ... especially when the firing has occurred only a short time after the hiring." *Grady v. Affiliated Central, Inc.,* 130 F.3d 553. 560 (2d. Cir.1997); *see also Phillips v. Merchants Ins. Corp.,* 3 F.Supp.2d 204, 209–10 (N.D.N.Y.1998) (hiring and firing by same person within two-year period gave rise to inference that motive was not discriminatory). The record shows that Golinkin, as publisher of the Magazine, was the person with ultimate responsibility both for hiring and firing Ricks, which Golinkin did within a period of just three months. The fact that other persons were involved at certain steps of this process— for example, Krumholz conducted a

---

1. That Conde Nast erred in thinking that Ricks was sufficiently qualified to hire her in the first place does not show that Ricks was in fact qualified. The record shows that Conde Nast noticed and began to document Ricks's performance problems from early on.

2. Ricks has asserted that Wirth was treated more favorably than her with respect to compensation, i.e., that he was entitled to a commission while she was not. Drawing all inferences in her favor, it will be assumed that this was true. However, this fact does not push her discriminatory termination claim over its evidentiary hurdle.

screening interview—does not change this fact. Thus, the facts of this case give rise to an inference, not of discrimination, but of nondiscrimination. *See Grady,* 130 F.3d at 560.

Second, Ricks fails to rebut the evidence offered by Conde Nast in support of its articulated reason for firing her, including evidence of specific incidents of poor performance and negative performance evaluations during her employment. Ricks attempts to counter this evidence by asserting that she was not properly trained, that her evaluations were unfair, or that her performance was satisfactory. As discussed above, the argument that she was not provided training is belied by the record, and she provides no evidence in support of her contention that others were provided with more.

The record also fails to support Ricks' assertion that her evaluations were "subjective and arbitrary". For example, she acknowledges failing to adequately articulate the magazine at a sales meeting to which she and Krumholz both went, but asserts that she was judged unfairly because she was not given notice that she would have to make the presentation while white account managers were given such notice. She offers no evidence, however, of differential treatment. It cannot be said that she has created a triable issue of fact as to whether her employer's expectations were in bad faith. *See Thornley,* 104 F.3d at 29–30.

■ At times Ricks also contends that in fact she did perform her job satisfactorily. This was also the essence of her October 7 memo in response to her final notice. The mere fact that an employee disagrees with her employer's assessments of her work, however, cannot standing on its own show that her employer's asserted reason for termination was pretextual. *See Taylor v. Polygram Records,* No. 94 CIV. 7689, 1999 WL 124456, at *10 (S.D.N.Y. March 8, 1999) (plaintiff's attempt to rebut

employer's explanation "by parsing the details of selected incidents, generally disputing her supervisors' assessments, and providing her own contrary appraisal of her work, is unavailing" in showing firing was pretextual).

Thus, for all the reasons discussed above, Ricks has failed to raise a triable issue of fact with respect to her claim that her termination was discriminatory.

#### B. *Retaliation*

In order to make out a *prima facie* case of retaliation, as set forth above, Ricks must show that: she was engaged in a protected activity; her employer was aware of his activity; she was subject to an adverse employment action; and there was a causal connection between her protected activity and the adverse action. *See Tomka,* 66 F.3d at 1308.

On September 12, 1997, Ricks' attorney sent a letter to Krumholz alleging that Ricks' civil rights had been violated on the job and asserting that legal action would be taken if this conduct continued. On September 26, she filed a charge with the EEOC. These activities are protected under Title VII. *See Manoharan,* 842 F.2d at 593. It is undisputed that the employer knew of them, nor does Ricks need to show that her discrimination claim was itself valid. *See Sumner,* 899 F.2d at 208–09.

■ Ricks cannot establish a causal connection between these activities and her termination, however, because prior to her attorney's letter Conde Nast had taken clear steps towards Ricks' termination. First, on August 26 Ricks was put on oral warning that she would be terminated within six weeks if her performance did not improve. Then, on September 4, she was given a written performance review which notified her that she would be terminated with 30 days if she did not improve. Thus, the temporal sequence of this case cannot give rise to an inference that her firing was caused by her complaints.[3] Nor

---

**3.** Ricks asserts that an inference of causation

can be shown because she complained to Sel-

is there other evidence supporting such an inference.

### C. *Hostile Environment*

As discussed above, in order to sustain a hostile environment claim, a plaintiff must show that her workplace is "permeated" with discriminatory conduct that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris,* 510 U.S. at 21, 114 S.Ct. 367. Title VII requires more than a merely "episodic pattern" of offensive, discriminatory conduct. *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1189 (2d. Cir.1987); *see also Shabat v. Blue Cross Blue Shield of the Rochester Area,* 925 F.Supp. 977, 982–83 (W.D.N.Y.1996). Nor does an offensive touching necessarily create a hostile environment, where it consists of an isolated incident of relatively minor severity. *See Babcock v. Frank,* 783 F.Supp. 800, 809 (S.D.N.Y.1992).

Ricks alleges the following offensive statements and act of offensive touching as creating a hostile work environment. The statements are: Krumholz's reference to Ricks as "a bug" who was going to get "squashed"; Krumholz's statement that Ricks was "a nuisance ... [who was] wearing down the carpet" outside Golinkin's office; Krumholz's statement that "either she [Krumholz] or someone else was going to rip [Ricks] a new a—hole"; and Golinkin's statement that Ricks' hair was "different than everybody else's". The offensive touching occurred when Cohen allegedly hit Ricks on the shoulder and pushed her out of her office.

The abusive conduct alleged by Ricks was not overtly directed at her because of her race.[4] Ricks also alleges, however, that Krumholz did not speak to other account managers "in the same manner" as she did Ricks, and that Cohen did not hit other account managers. "Direct comparative evidence" as to how an alleged harasser treated both the plaintiff and those who were not part of the plaintiff's protected group is an acceptable form of evidence as to intent in a hostile environment claim. *Oncale,* 523 U.S. at 80–81, 118 S.Ct. 998; *see also Mitchell v. Fab Industries Inc.,* 990 F.Supp. 285, 293 (S.D.N.Y.1998). The plaintiff must still show, however, that the offensive conduct actually constituted discrimination because of race. *See Oncale,* 523 U.S. at 81, 118 S.Ct. 998. In this case, the sole evidence offered as to intent by Ricks is that she was treated differently than the non-African American account managers. It is a question whether or not standing alone this is sufficient. Even if it is presumed that it would be, however, Ricks' claim nonetheless fails because the conduct she alleges is not sufficiently severe as to give rise to a Title VII violation.

Ricks has alleged incidents which must have been offensive and unpleasant. However, the verbal incidents were episodic in nature rather than pervasive, and the sole physical incident was both isolated and of a relatively minor nature. Nor is Ricks' claim bolstered by her contention that part of the harassment she experienced included other forms of unfair treatment, such as discriminatory performance evaluations. As already discussed above, Ricks has not offered evidence giving rise to an inference

den on September 3, 1997, about Cohen's having hit her and Krumholz's comments. Ricks does not allege, however, that she complained that the abuse she alleged was discriminatory in nature, and therefore her complaint would not constitute protected activity. In any event, she had been put on oral warning of termination on August 26 even before going to Selden.

**4.** A possible exception is Golinkin's comment along the lines that Ricks's hair was "differ-

ent than everybody else's," a comment which could be considered racially inflected. However, the record is extremely thin on this point, as Ricks admits that she recalls neither the exact words Golinkin used nor their context. In any event, even if this comment were found to be both race-based and hostile, it would not enable Ricks's claim to satisfy the requirements of Title VII as to severity or pervasiveness.

of discrimination in her performance evaluations or other treatment on the job. Thus, the record reveals that her hostile work environment claim is not sustainable.

#### IV. *An At Will Employee May Assert Section 1981 Claims*

This Court has held that claims of an at-will employee for discrimination are proper under Section 1981 for the reasons set forth in *Equal Employment Opportunity Commission v. Die Fliedermaus, L.L.C.*, 77 F.Supp.2d 460, 469–70 (S.D.N.Y. 1999).

In this case, however, Ricks' claims under Section 1981 are dismissed because, just as she has failed to create a triable issue of fact with respect to her Title VII claims, so she has failed to do with respect to her Section 1981 claims. *See Humphrey v. Council of Jewish Federations*, 901 F.Supp. 703, 710–11 (S.D.N.Y.1995).

#### *Conclusion*

For the reasons stated herein, the motion for summary judgment is therefore granted.

It is so ordered.