Judy BROWN, Plaintiff,

v.

**SOCIETY FOR SEAMAN'S CHILDREN, Defendant.**

No. 98 CV 0126(NG)(CLP).

United States District Court, E.D. New York.

March 28, 2002.

183

Judy Brown, pro se.

David H. Diamond & Tracey J. Levey, Proskaver Rose LLP, New York, for defendant.

## ORDER

GERSHON, District Judge.

The Society for Seaman's Children, now known as the Seamen's Society for Children and Families ("Society"), is a not-for-profit social services agency that provides foster care, adoption and counseling services in Brooklyn, Queens and Staten Island. The Staten Island office also provides assistance to runaways, homeless youth and other youth services, family day care, substance abuse treatment programs, and domestic violence services. Plaintiff Judy Brown was employed beginning 1986 in the Staten Island office, and held the title of Administrative Supervisor in the Teen Advocacy Program ("TAP") from 1990 until her termination in 1996. Following plaintiff's discharge, she filed a complaint under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, alleging that, as a black female, plaintiff's termination was the product of discrimination on the basis of race, color and gender. Following a recommendation by the New York State Division of Human Rights, the EEOC determined that the evidence did not establish a violation, and issued a right-to-sue letter. This action, in which plaintiff has represented herself, followed. Following full opportunity for discovery, the defendant now moves for summary judgment.

### Facts

The following facts are undisputed except where otherwise indicated.

Diane Sjolin, the Director of Youth Services, which included TAP, originally hired plaintiff as a social worker in TAP following interviews of plaintiff by Sjolin and Virginia Hartie, the Society's Director of Human Resources, primarily to provide counseling services to teenagers. Sjolin was plaintiff's immediate supervisor throughout her employment with the Society. Plaintiff was promoted first to be an assistant director and then, in 1990, was made administrative supervisor with an increased salary. Plaintiff testified that she thought that she should have been promoted from assistant director to director, instead of administrative supervisor, but despite "community feedback" that she was not made a director for racial reasons, plaintiff admitted that she did not make her dissatisfaction with her 1990 promotion known at the time, and there is no indication in the record that she made her dissatisfaction known at any time prior to her termination. Sjolin periodically prepared personnel evaluations of plaintiff, both before and after her promotions. Sjolin's evaluations of plaintiff's attitude, ability and performance were highly favorable generally, and at times Sjolin's praise was effusive. Sjolin's 1988 evaluation stated that plaintiff "is a pleasure to supervise," "is by nature a doer—she gives her all to her clients and the agency as a whole," "gets along well with co-workers, administrative staff, etc.," is a "fine representative of the agency," and concluded: "Judy is an outstanding worker and co-worker. I'd love to clone her." A 1994 evaluation described the additional responsibilities that plaintiff had assumed during periods of difficulty for certain Society programs, and the "vital" and "key" role she had played in planning and implementation of changes in programs. The 1994 evaluation referred to plaintiff's "excellent" ability "to set clear goals and to work with her staff in their achievement," stated that she had "developed into a fine supervisor" who was "good at handling crisis situations," and characterized her as an "excellent representative of our agency" with the public. Plaintiff acknowledged at her deposition that she believes she was treated fairly and was not subject to discrimination as a social worker or as supervisor, with the exception of the above-noted failure to make her a director in 1990, until the incidents in 1996 that led to her termi-

nation. Sjolin agreed in her deposition testimony that she had no complaints concerning plaintiff's performance before 1996; although they occasionally had disagreements, these matters were resolved amicably. Sjolin approved another salary increase for plaintiff in October 1995. In 1996, the makeup of the Society's employees was 38% black, 31% Hispanic, 25% white and 6% biracial; 87.5% were women.

Plaintiff maintains that Sjolin's attitude changed dramatically in 1996, and that Sjolin engaged in intimidating, threatening and demeaning conduct toward plaintiff. Sjolin, on the other hand, claims that plaintiff had engaged in a series of actions that were hostile and insubordinate, demonstrating an inability to accept the proper exercise of supervisory authority by Sjolin.

The first incident began on April 29, 1996. Plaintiff was responsible for supervising intake, which included handling walk-ins and telephone calls on the Society's hotline for referral to TAP services for assistance, including emergency assistance. In that capacity, plaintiff supervised Raymond Martinez, the intake coordinator, who prepared the schedules for staffing of intake. Plaintiff and Sjolin had previously discussed the need to utilize the Society's volunteers to assist in staffing intake because of shortages in the regular staff but, according to plaintiff, they had agreed that there were personnel issues that needed to be resolved before the volunteers could be used for that purpose. Plaintiff therefore was surprised to find that Martinez had allowed a volunteer, "Pearlie," to accompany him on April 29 as he performed intake duty. Plaintiff testified that, when she questioned Martinez, he advised her that he did not want to train one volunteer at a time, but he had been instructed by Sjolin to take Pearlie with him that day. Plaintiff telephoned Sjolin in Martinez's presence and put the call on speaker phone. Sjolin at the time

was manning the hotline. Plaintiff testified that her purpose in calling Sjolin was to seek clarification of her instructions, since plaintiff had not been advised of Sjolin's direction to Martinez. Plaintiff denies expressing anger, raising her voice, being disrespectful or otherwise acting inappropriately during that call, but admits that she expressed confusion and frustration that Sjolin had taken this action without either Sjolin or Martinez talking to her. Sjolin, however, interpreted plaintiff's behavior during the call as rude and an inappropriate challenge to Sjolin's authority as Director to make decisions in TAP without necessarily having to consult plaintiff or obtain her concurrence. Sjolin also denies that she had instructed Martinez to train Pearlie notwithstanding her prior conversation with plaintiff in which they had agreed that there were issues to be resolved before volunteers could be used for intake. Sjolin maintains that she simply decided that since Pearlie was not needed for other tasks that day, it was a good opportunity to allow her to observe Martinez. Plaintiff and Sjolin discussed the incident during their next regularly scheduled supervisor's meeting on May 1, where Sjolin expressed her displeasure with plaintiff's conduct and admonished her that it should not be repeated.

Sjolin then discussed this incident with her supervisor, Linda Santlofer, Vice President of Community Programs. Santlofer instructed Sjolin to memorialize the matter in writing and to include a copy in plaintiff's personnel file. Plaintiff testified that she thought that this matter had ended with her May 1 discussion with Sjolin, and she was "shocked" and "surprised" to receive Sjolin's memorandum, dated May 10, 1996, which set forth Sjolin's characterization of the above events, calling plaintiff's behavior "unprofessional" and her tone on the telephone as "argumentative, loud and threatening." Sjolin's memorandum add-

ed: "I am distressed that you continue to bring up conflicts that I believed were resolved several years ago. This demonstrates that you have difficulty 'letting go.' " Sjolin concluded by questioning plaintiff's ability to be a team player and her commitment to TAP. Although the memorandum invited plaintiff to meet with Sjolin and Santlofer to discuss the matter further, plaintiff testified that in view of the tone and substance of the memorandum, including its false statements, she needed to protect herself with a written response instead.

Plaintiff replied in writing on May 15 to this "unexpected memo," giving her version of the events and emphasizing that the sole purpose of her April 29 call to Sjolin was to seek clarification, "to avoid conflict and triangulation," not to challenge Sjolin's authority or to assert plaintiff's own. Plaintiff asserted in the memorandum that she became "extremely frustrated" during the telephone conversation when Sjolin belittled her concerns, especially after Sjolin disclosed that, unknown to plaintiff, she had already met with the volunteers and told them they could work on intake. Plaintiff also asserted that the incident was not an isolated one, as Sjolin had on other occasions undermined plaintiff's supervision of others. Plaintiff then questioned Sjolin's "motive and intentions" in preparing her memorandum and placing a copy in plaintiff's personnel file. Plaintiff requested that Sjolin explain what she meant about reviving old conflicts, because plaintiff did not know what Sjolin was referring to, and she also requested that Sjolin's memo be removed from plaintiff's personnel file, stating that it was unfair and suggested a "double standard at Society." By memorandum dated May 17, Sjolin replied that it was "not possible" to remove her memo but that plaintiff's response would be included in the file.

The staff became aware of the dissension between plaintiff and Sjolin. Plaintiff acknowledged that relationships within TAP had become strained. She testified that there were "power struggles," "favoritism" and "mistrust" in her unit, but that she was being wrongly accused of being the cause of dissension. At a staff meeting on May 17, Sjolin forcefully demanded that the staff put such matters aside and go about their business. Plaintiff asserted that Sjolin was loud and threatening at that meeting, used profanity, and questioned everyone's commitment; Sjolin admitted being angry and acknowledged cursing once. By memorandum dated May 22, responding to Sjolin's May 17 memo, plaintiff described Sjolin's behavior at the May 17 meeting as set forth above and questioned whether the Society had a double standard by which Sjolin and "others" could act with impunity while plaintiff and "others" were disciplined for similar, but less extreme conduct. Plaintiff renewed her request that Sjolin explain her reference to old conflicts if she would not remove the May 10 memo from plaintiff's personnel file.

The next incident, on May 31, 1996, also arose out of an instruction Sjolin gave to Martinez without discussing it with plaintiff and without plaintiff's knowledge. Shortly before leaving for a one-week vacation, Sjolin told Martinez that he should not schedule Belle Romero–Key for intake duty during June. Romero–Key had just returned from an extended absence for medical reasons, and Sjolin felt that it was more important that she catch up on her paperwork. Sjolin told Martinez that she planned to advise plaintiff before she left for vacation, but she did not do so. Martinez prepared the schedule and plaintiff approved it without knowing of the omission, but after plaintiff received complaints from one or two staff members about the matter, she first learned from Martinez of

Sjolin's instruction. Plaintiff whited out her initials and instructed Martinez to prepare another version of the schedule that included Romero–Key. Plaintiff admonished Martinez for not informing her of Sjolin's direction so that everyone would be on the same wavelength. Plaintiff has admitted that she whispered under her breath that if this continues to happen, she would put it in her evaluation of Martinez. (Plaintiff admitted making the statement in a contemporaneous memorandum and in parts of her deposition testimony, but also denied in the deposition that she had threatened Martinez.) Although plaintiff had not intended it, Martinez heard her and loudly demanded that she repeat what she had said. Plaintiff did so but urged him to calm down and explained that she just wanted to work things out so that there would be no "triangulation" or misunderstandings.

Plaintiff then called Sjolin at home. Without telling Sjolin, she asked a co-worker, Samantha Dawkins, to listen in on the conversation on the speaker phone in order to protect herself.[1] Once again, plaintiff characterized the purpose of her call as seeking clarification. Plaintiff testified that Sjolin agreed that she should have told plaintiff about her decision, they agreed that Sjolin would review the schedule when she returned from vacation and decide which version to use, and they agreed to discuss the matter further after plaintiff returned from her own vacation scheduled for the following week. Sjolin, however, described plaintiff's tone as angry and testified that she viewed the incident as another inappropriate attempt by plaintiff to assert her authority and a further illustration of plaintiff's inability to accept Sjolin's superior authority as director of TAP.

Martinez complained to Santlofer about his meeting with plaintiff of May 31. Santlofer told him that he should either discuss the matter with plaintiff or memorialize the incident in writing. Martinez prepared a memorandum dated June 4, 1996, addressed to Sjolin, describing the incident and expressing his unease at plaintiff's "delicate and indirect" threat of a negative evaluation for having followed Sjolin's instructions. The Martinez memorandum stated that it was the second such incident in the past several months, although plaintiff had generally treated Martinez "professionally and respectfully." Santlofer, Sjolin and Virginia Hartie, the Director of Human Resources, met to discuss the situation. Gerard McCaffery, who had just started that week as the Society's new President and Chief Executive Officer, joined the discussion. These witnesses claim that McCaffery was never advised of the identity, race or gender of the supervisor under Sjolin that they were discussing, but solicited his opinion as to what should be done. (Plaintiff questions the credibility of this testimony, especially the notion that the person was never referred to as "she".) McCaffery suggested that the individual should be suspended for a brief period to ponder her future with the Society, but the others rejected that treatment as being harsher than previous responses by the Society to disruptive behavior. Instead, they decided that plaintiff should be placed on probation if Martinez's account of the meeting was accurate.

Plaintiff returned from vacation on June 10 and immediately was brought to a meeting with Santlofer, Sjolin and Hartie. Santlofer told plaintiff that she and Sjolin had to spend the previous week extinguishing the "fires" that plaintiff had start-

1. Neither party has submitted an affidavit from Dawkins or Martinez, and they appar- ently were not deposed in this action.

188

ed. Plaintiff explained her version of her encounter with Martinez on May 31 and the telephone conversation with Sjolin. Plaintiff acknowledged making the comment to Martinez about his evaluation, explaining that she had not meant to threaten him but was frustrated by the lack of proper communication. Plaintiff was immediately placed on probation for a period of three months. Santlofer's memorandum of June 10 stated the reasons for the action as: (1) the implied threat to Martinez for following a request from the TAP Director without clearing it with plaintiff; (2) plaintiff's continual conflict with Sjolin in which "on at least two occasions" plaintiff acted unprofessionally. (Defendant does not now claim that there were any other serious incidents of misconduct by plaintiff beyond the ones described). Santlofer's memorandum blamed plaintiff for encouraging continued "strife and triangulation" within TAP. Plaintiff felt that she was being treated in an unfair and discriminatory fashion by being placed on probation over this incident.

Plaintiff on June 13 made a written request to McCaffery for a meeting in accordance with the personnel manual. McCaffery met with plaintiff that day and, after listening to her explanation, requested her to put it in writing and attach the pertinent memos for his review. Plaintiff responded to McCaffery's request for a written explanation with a detailed memorandum dated June 25 which, in addition to attaching the earlier memoranda and stating the facts from plaintiff's perspective, characterized the June 10 meeting as demeaning, argued that her being placed on probation was out of proportion to any possible infraction she might be deemed guilty of, and expressed willingness to attempt to work out her differences with Sjolin. After reviewing plaintiff's memorandum, McCaffery concluded that there were serious communication issues and disagreements between plaintiff and Sjo-

lin, and that it would be inappropriate to second-guess the determination of plaintiff's supervisors that she should be placed on probation. McCaffery explained this decision in a memorandum to plaintiff dated July 1, 1996, which reminded plaintiff that Sjolin ultimately was responsible for managing and directing programs and staff and for making decisions within the unit. He advised plaintiff to decide if she could work closely with Sjolin, and to some degree with Santlofer, and, if she could not, "to decide how best to move on to another position in the agency or somewhere else."

McCaffery met again with plaintiff, who requested that, in accordance with the employee manual, her grievance be submitted to the Board of Trustees. McCaffery explained to plaintiff that this practice had been or was being changed, and that he now had the final say in personnel matters without further review by the Board. However, since this was a new policy which had not yet been communicated to employees, McCaffery told plaintiff that, if she prepared a letter to the Board of Trustees, he would forward it to its President for his consideration of the request. Plaintiff did not do so. Plaintiff admits that McCaffery made the offer but felt that she was entitled as of right to the grievance procedure as set forth in the employee manual, and she so informed McCaffery. (The staff was first formally notified of the changes in the grievance procedure by memorandum from McCaffery dated August 16, 1996, after plaintiff had been discharged.)

The final incident occurred on July 7, 1996, when plaintiff met Sjolin for their routine weekly meeting. According to plaintiff, Sjolin stated at the outset that she could not continue to work with plaintiff. Sjolin said she had heard that plaintiff had written a memo to McCaffery, and

that plaintiff had falsely accused Sjolin of using profanity during a staff meeting. Sjolin stated that plaintiff would not get off probation soon. Sjolin asked plaintiff if she was seeking "power", asked plaintiff is she thought she now supervised "Sam" (Samantha Dawkins) also because Sjolin had heard that they were having lunch together, and accused plaintiff of not caring about the Society. When plaintiff asked if the Society cared about her, Sjolin responded that "it's nothing but your bread and butter." Plaintiff then said that Sjolin had hired her, but did not own her, and the discussion thereafter became loud and heated. Sjolin told plaintiff to leave; plaintiff replied that she was not a dog. After Sjolin tried unsuccessfully to reach McCaffery, they resumed a more civil discussion. Sjolin in her deposition testimony denied making many of the specific statements that plaintiff attributed to her. Sjolin claimed that the meeting began as a routine supervisory meeting, but degenerated as plaintiff became loud and argumentative and ended with plaintiff refusing to leave Sjolin's office. McCaffery was advised of this incident by either Santlofer or Hartie, who recommended plaintiff's termination, and McCaffery did so the next day. McCaffery, Santlofer and Hartie testified that plaintiff was terminated for conflicts with her supervisor and inability to accept supervision. Sjolin testified that plaintiff was terminated, not for conflicts as such, but because of the manner in which she reacted to those conflicts.

According to Santlofer and Sjolin, the responsibilities of plaintiff's position were divided among three people who became supervisors. Martinez (a white Hispanic male) became responsible for the runaway youth program, Dawkins (a black female) for pregnancy prevention and a teen services program, and Romero–Key (a black and Hispanic female) for a youth development program. Plaintiff believed that Martinez assumed her responsibilities, thereby demonstrating in her view discrimination based on race and sex, but she admitted that she did not know how all of her duties were assigned after she was discharged.

## Discussion

### Summary Judgment Standards

Motions for summary judgment are granted if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *See Lipton v. Nature Co.,* 71 F.3d 464, 469 (2d Cir.1995). The moving party must demonstrate the absence of any material factual issue genuinely in dispute. *See id.* The court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, the non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The party must produce specific facts sufficient to establish that there is a genuine factual issue for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In a discrimination action such as this, it is important to note that:

> "[a] victim of discrimination is ... seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence .... Consequently, in a Title VII action, where a defendant's intent and state of mind are placed at issue, summary judgment is ordinarily inappropriate."

*Rosen v. Thornburgh,* 928 F.2d 528, 533 (2d Cir.1991) (citations omitted). On the

other hand, "[t]he summary judgment rule would be rendered sterile ... if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

### Plaintiff's Discrimination Claim

 Plaintiff claims that her termination was a discriminatory action that was taken on the basis of her race and gender, in violation of Title VII. Discrimination claims are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green.* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, a plaintiff must prove by a preponderance of the evidence a prima facie case of discrimination. *See Bickerstaff v. Vassar College*, 196 F.3d 435, 446 (2d Cir.1999), *cert. denied*, 530 U.S. 1242, 120 S.Ct. 2688, 147 L.Ed.2d 960 (2000). In order to establish a prima facie case, a plaintiff ordinarily must demonstrate that: (1) she belongs to a protected class; (2) she was performing satisfactorily; (3) she was discharged; and (4) the decision to discharge occurred under circumstances giving rise to an inference of discrimination based on her membership in the protected class. *See Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994). Once a prima facie case has been established, the employer must articulate a legitimate, non-discriminatory reason for having taken the action of which the plaintiff complains. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254–55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell–Douglas Corp.*, 411 U.S. at 802–03, 93 S.Ct. 1817. If this is done, the burden shifts back to the plaintiff to prove that the allegedly legitimate reason is merely a pretext for discrimination. *See McDonnell–Douglas Corp.*, 411 U.S. at 804, 93 S.Ct. 1817. However, "a

reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (citation omitted); *see also Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 146, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (holding that the fact-finder may infer discrimination from the falsity of the employer's explanation). In the summary judgment context, *St. Mary's* requires a plaintiff to "establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for discharging her is false *and* as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." *Gallo v. Prudential Residential Services Ltd. Partnership*, 22 F.3d 1219, 1225 (2d Cir.1994) (emphasis in original). Evidence satisfying the prima facie requirement, coupled with evidence of the falsity of the employer's explanation, may or may not be sufficient to satisfy a finding of discrimination in a particular case. The factors to consider include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and other evidence that supports or undermines the employer's case. *See Reeves*, 530 U.S. at 147–49, 120 S.Ct. 2097; *James v. New York Racing Ass'n*, 233 F.3d 149, 156–57 (2d Cir.2000).

 In this case, defendant does not argue that plaintiff was not "qualified" for her position, but maintains that plaintiff failed to establish the fourth element of a prima facie case, that she was discharged under circumstances giving rise to an inference of unlawful discrimination, and that plaintiff failed to present admissible evidence which reasonably supports an in-

ference that plaintiff's termination was the product of intentional discrimination that would create a genuine issue of material fact for trial. It is unnecessary to decide whether the plaintiff has met her "minimal" burden of establishing a prima facie case, *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir.2001), because no reasonable factfinder could conclude that the defendant's neutral explanation for terminating plaintiff was false or that her termination was motivated by racial or gender animosity.

The facts set forth earlier in this opinion show without dispute that the relationship between plaintiff and her immediate supervisor, Diane Sjolin, became heated in 1996 and that they had a series of verbal altercations in little over two months that ended in plaintiff's discharge. Moreover, although plaintiff felt she had been treated unfairly, there is little dispute as to those events. There simply is no basis in the record from which a rational juror could find that the reasons given for plaintiff's termination—her conflicts with her supervisor, unwillingness to accept that supervisor's authority, and the disruption and dissension that these conflicts had created—were false or a pretext for discrimination.

Plaintiff's claims that she had justifiably become exasperated with the actions of Sjolin and others, and that she was not at fault for the difficulties that developed within TAP and particularly in her relationship with Sjolin and Martinez, do not support a claim of pretext.

[Plaintiff's] attempt to rebut Defendants' proffered explanation by parsing the details of selected incidents, generally disputing her supervisors' assessments, and providing her own contrary appraisal of her work, is unavailing. Her Affidavit and memoranda may raise issues concerning the reasons *why* she failed to perform her job .... However, this evidence does not raise an issue of fact regarding the overall legitimacy of the proffered explanation.... [P]laintiff does not dispute the fact that these incidents actually occurred.... The evidence, even if viewed most favorably to Plaintiff, merely serves to shift the blame for, or rationalize, these incidents to show that the criticism was undeserved. But, faulting others for, or otherwise rationalizing, problems legitimately perceived by her employer does not establish pretext.... [Plaintiff]'s fundamental disagreement with the conclusions her supervisors drew from incidents which she admits occurred, and her subjective belief that they should not have reflected badly on her performance because they were someone else's fault, is not evidence that her supervisors' appraisals were a sham, invented to mask discrimination.

*Taylor v. Polygram Records*, 1999 WL 124456, at *10 (S.D.N.Y.1999) (emphasis in original). *See also Ricks v. Conde Nast Publications, Inc.*, 92 F.Supp.2d 338, 347 (S.D.N.Y.2000), *aff'd*, 6 Fed.Appx. 74 (2d Cir.2001) ("The mere fact that an employee disagrees with her employer's assessments of her work ... cannot standing on its own show that her employer's asserted reason for termination was pretextual.").

 "Title VII may not be used as a vehicle for second-guessing an employer's business judgment." *Davidson v. Time, Inc.*, 972 F.Supp. 148, 153 (E.D.N.Y.1997). The employer is "permitted to make bad business judgments and misjudge the work of employees as long as its evaluations and decisions" are not made for prohibited discriminatory reasons such as race or gender. *Brown v. Time, Inc.*, 1997 WL 231143, at *12 (S.D.N.Y.1997). Plaintiff's effort to shift the blame therefore is unavailing. Engaging in rude, threatening and combative behavior toward co-workers and supervisors is a legitimate business

reason for termination, and in acting upon reports of such conduct, the employer does not engage in discrimination even if those reports are untrue or unfair. *Griffin v. Ambika Corp.*, 103 F.Supp.2d 297, 308–10, 313 (S.D.N.Y.2000). Plaintiff's complaints, in turn, that Sjolin was rude, threatening and combative toward her evidences the hostility between them, but does not provide ground for inferring that the hostility stemmed from plaintiff's race or gender. *Bickerstaff*, 196 F.3d at 451 ("Title VII does not insulate an individual from criticism that is not based on an impermissible reason"); *Taylor v. Polygram Records*, at *16 (plaintiff's "belief, based on no evidence other than gut instinct, that [her supervisor] treated her with hostility because of her *race*, cannot justifiably support an inference of discrimination" when nothing in the record supported that linkage; emphasis in original).

■ Plaintiff contends that she was singled out for discriminatory treatment because, unlike other employees, she was disciplined for engaging in verbal disputes. Since plaintiff conceded in her deposition testimony that those other individuals who were not disciplined were of both genders and different races, her claim does not evidence discriminatory conduct. Plaintiff's principal complaint of disparate treatment appears predicated upon the Society's failure to discipline Sjolin for her outbursts while it discharged plaintiff for similar behavior. As plaintiff's supervisor, however, Sjolin was not similarly situated, and plaintiff's perceived inability to accede to Sjolin's superior decisionmaking authority cannot be fairly equated with the misconduct by Sjolin which plaintiff alleges. Moreover, plaintiff, unlike Sjolin, threatened an employee, Martinez, with a possible negative performance evaluation for following the instructions of a more senior officer without first clearing it with her.

■ Plaintiff also points to the good evaluations that she had received, but that evidence does not tend to show that her discharge was the product of discrimination. Plaintiff was discharged because of conflicts with her supervisor that she admits first became serious in 1996, not for lack of skill, diligence or initiative, so those earlier evaluations are not probative that she was treated in an arbitrary and discriminatory fashion in 1996. If anything, the fact that she was hired by and received those favorable evaluations and promotions from Diane Sjolin, the person who was primarily instrumental in her termination, tends to refute her claim of discrimination. *Brinson v. New York City Transit Auth.*, 60 F.Supp.2d 23, 29 (E.D.N.Y.1999), *aff'd*, 213 F.3d 625 (2d Cir.2000). *See also Taylor v. Polygram Records*, at *14 ("The fact that [plaintiff] may have received prior positive evaluations cannot in itself demonstrate that her later negative evaluations, and the concomitant proffered explanation, are unworthy of credence."); *Moorer v. Grumman Aerospace Corp.*, 964 F.Supp. 665, 674 (E.D.N.Y.1997), *aff'd*, 162 F.3d 1148 (2d Cir.1998) (same).

■ Plaintiff also claims that there were procedural irregularities in the manner in which she was disciplined and then discharged. First, plaintiff claims that the personnel manual's procedure for successive discipline—an oral reprimand, a written reprimand, probation and termination—was not followed. Since the only excerpt from the manual that has been submitted states that this procedure is "ordinarily" followed, and in view of the unusual nature of the conflict here among supervisory personnel that was brought to the attention of the Society's senior management at an early stage, the alleged failure to follow the letter of the manual does not supply evidence of arbitrary or discriminatory treatment. Plaintiff has

not furnished admissible evidence that she was treated differently from anyone else similarly situated. *See Stanojev v. Ebasco Services, Inc.*, 643 F.2d 914, 923 (2d Cir. 1981) (holding that a defendant's alleged failure to follow termination procedures does not support a discrimination claim where there is no evidence that the termination procedure was employed differently to protected and non-protected employees). Her assertion amounts to quibbling over whether she had received an oral and then a written "reprimand", when there is no dispute that Sjolin complained of her conduct both orally and in writing. Second, plaintiff asserts that contrary to normal procedure, she was placed on probation by Santlofer, the Vice President of Community Relations and Sjolin's superior, instead of by Sjolin, plaintiff's immediate supervisor. This does not evidence discriminatory treatment and, as Santlofer explained without contradiction, was deemed to be appropriate in light of the conflict between plaintiff and Sjolin and plaintiff's apparent resistance to Sjolin's direction. Third, plaintiff particularly emphasizes McCaffery's denial of review by the Board of Trustees in accordance with the personnel manual. Since plaintiff declined McCaffery's offer to refer her request to the President of the Board if she made it in writing, plaintiff may not be heard to complain that the denial of her request shows discriminatory behavior. Moreover, McCaffery explained without contradiction that when he was first interviewed by the Board before being hired, they discussed plans to eliminate Board involvement in personnel matters in light of the experience with the last employee terminated, a white male; that the change in procedure was in the process of being implemented when plaintiff's request was made during McCaffery's first month in office; and that the staff received written notification of the change a month after plaintiff was discharged. Defendant's evidence that, thereafter, no employee was afforded review by the Board of Trustees is uncontradicted.

Plaintiff enumerates various incidents involving other minority employees whom she claims were terminated or otherwise treated unfairly. However, plaintiff did not have first-hand knowledge of these matters and did not otherwise present admissible evidence concerning them. Her assertions are based on rumor and hearsay and may not be considered in opposition to the defendant's well-documented motion for summary judgment. In addition, plaintiff did not show that these alleged instances of unfair employment practices involved the same supervisors who were involved in plaintiff's termination, and therefore they lack probative value in demonstrating that plaintiff was the victim of discriminatory treatment. Plaintiff's generalized claim of a discriminatory atmosphere, unaccompanied by admissible evidence of specific instances of discriminatory conduct, also is properly disregarded. *Bickerstaff*, 196 F.3d at 456 (feelings and perceptions of isolation, hostility and discrimination are not evidence of discrimination); *Moorer*, 964 F.Supp. at 675 (plaintiff's unsupported allegation "that he felt 'racial tension' from [supervisor] is insufficient to create a genuine issue of material fact").

Plaintiff also relies on affidavits from two of her former co-workers whom she supervised. These employees did not have direct knowledge of the circumstances leading to plaintiff's termination, and neither their favorable evaluations of plaintiff's attitude and performance as a supervisor nor their suspicions of pretext or racism in plaintiff's discharge create a genuine issue of fact as to the motivations of those who made the decision to terminate plaintiff. *See Bickerstaff*, 196 F.3d at 451–53; *Gambello v. Time Warner Com-*

*munications, Inc.*, 2002 WL 264253, at *12 (E.D.N.Y.2002). Plaintiff's claim of discriminatory motivation also is belied by the Society's action in promoting individuals who were female and black to assume portions of the supervisory responsibilities that plaintiff had performed. As noted earlier, plaintiff's assumption that her duties were assumed by Martinez was met with the defendant's evidence, which plaintiff did not refute with admissible evidence, that Martinez was given only a portion of those responsibilities.

Finally, plaintiff's belated expression of dissatisfaction with her failure in 1990 to be promoted to be a Director, instead of Administrative Supervisor, sheds no light at all on the reasons that she was terminated in 1996, which is the sole ground for plaintiff's petition before the EEOC and the complaint in this action. Defendant correctly points out that plaintiff is now barred from seeking relief on the basis of the 1990 promotion decision. *See Brown v. Time, Inc.*, at *3–5 (rejecting "continuing violation" theory to avoid dismissal of claim of failure to promote that was not timely raised in EEOC petition or complaint).

### Conclusion

The defendant's motion for summary judgment is granted and the complaint alleging violations of Title VII of the Civil Rights Act of 1964 is dismissed. The court declines to exercise supplemental jurisdiction over state law claims, if any, that plaintiff may have intended to include in the complaint, and any such claims are dismissed without prejudice.

**SO ORDERED.**